**AMERON, INC., Plaintiff,**

v.

**U.S. ARMY CORPS OF ENGINEERS, et al., Defendants.**

**Civ. No. 85–1064.**

United States District Court, D. New Jersey.

May 28, 1985.

Theodore Botter, Meyer and Landis, Newark, N.J., for Ameron, Inc.

Charles Tiefer, Deputy Gen. Counsel to the Clerk, Steven R. Ross, Gen. Counsel to the Clerk, Michael L. Murray, Asst. Counsel to the Clerk, Washington, D.C., for plaintiff-intervenors, Speaker and Bipartisan Leadership of the U.S. House of Representatives.

Morgan Frankel, Asst. Senate Legal Counsel, Michael Davidson, Senate Legal Counsel, Washington, D.C., for plaintiff-intervenor, U.S. Senate.

Edward G. Spell, Asst. U.S. Atty., Deputy Chief, Civ. Div., Newark, N.J., for the U.S. Army Corps of Engineers.

Brian Mahoney, D'Alessandro, Sussman, Jacovino & Mahoney, Florham Park, N.J., for defendant Spiniello Const. Co.

## OPINION

HAROLD A. ACKERMAN, District Judge.

On March 27, 1985 I ruled on the plaintiff's motion for a preliminary injunction in this matter holding that although the Army Corps' decision to reject Ameron's bid was unreviewable, the Army Corps must hold up all work on the contract until the Comptroller General had reviewed Ameron's protest in accordance with the Competition and Contracting Act (CICA) Public Law No. 98–369, 98 Stat. 494 (1984), which I found to be constitutional, 607 F.Supp. 962.

Since my ruling the Comptroller General has reviewed plaintiff's protest pursuant to CICA provision 31 U.S.C. § 3553(d)(1) and has issued a decision denying plaintiff's protest. As there seemed to be no disputes of fact in this case, but only strongly contested disputes of law, plaintiff-intervenors have now moved for summary judgment. In addition, the defendants have moved to dissolve the preliminary injunction in light of the GAO's issuance of a decision on plaintiff's protest.

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment is not to be granted unless, after all reasonable inferences are drawn in favor of the non-moving party, there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. *See DeLong Corporation v. Raymond International*, 622 F.2d 1135 (3d Cir.1980).

Thus I must give each party in turn the benefit of any reasonable inferences in their favor should there be any factual disputes.

■ The plaintiff-intervenors have also requested that the Secretary of Defense, the Honorable Casper W. Weinberger, and Office of Management and Budget Director, the Honorable David A. Stockman, be joined in order to effectuate complete relief in any order issued by this Court. I find it necessary and proper to join these two individuals as defendants and the relief sought in that respect will be granted.

I will first address plaintiff's motion for summary judgment concerning the legality of the denial of its bid in the first place. Plaintiff contends that the Comptroller General's decision is irrational and unreasonable and conflicts with established law concerning alteration of documents. Plaintiff's counsel has enlarged on that theme very eloquently today and, of course, his brief speaks also to the points. I may say that I have already substantially addressed these arguments in my opinion on March 27, 1985. After careful consideration of Ameron's brief and its oral argument today, I must say that the presentation of these arguments does not change my analysis of the law from what it was on the motion for preliminary injunction. I find, as a matter of law, that the Army Corps' decision was not illegal or irrational, and I, therefore, cannot interfere with that decision. My reasoning relies principally on *Princeton Combustion Laboratories v. McCarthy*, 574 F.2d 1016 (3d Cir.1982) and is discussed in more detail on pages 8 to 11 of my previous opinion.

Plaintiff's motion for summary judgment is accordingly denied in part. For the same reasons I grant defendants' cross-motion for summary judgment as to the issue of the legality of the Army Corps' denial of Ameron's bid. The denial of Ameron's bid had a legal and rational basis and will not be disturbed by this Court.

I turn then to the plaintiff-intervenor's motion for summary judgment concerning the constitutionality of the stay provisions in CICA. Defendant's have cross-moved for summary judgment on this same issue.

All parties agree that there are no disputed issues of material fact, and each party maintains its original position that it is entitled to judgment as a matter of law.

■ Before I can consider any further motions in this matter, I must determine whether this Court still has jurisdiction over this matter following the Comptroller General's dismissal of Ameron's bid protest. It is axiomatic that federal courts may constitutionally decide only actual controversies. *See*, e.g. *Southern Pacific Terminal Co. v. Interstate Commerce Commission*, 219 U.S. 498 at 514, 31 S.Ct. 279 at 283, 55 L.Ed. 310 (1911). This Court preliminarily enjoined defendant from proceeding any further with the contract award until the Comptroller General decided Ameron's bid protest in compliance with the provisions of the Competition in Contracting Act. As I stated earlier, the Comptroller General has now decided the bid protest and issued a decision all in accordance with CICA.

While the legal merits of the Army Corps denial of Ameron's bid did remain for final adjudication following the preliminary injunction, the question of the constitutionality of CICA may possibility be moot.

All parties urge that this issue is still justiciable under the "capable of repetition, yet evading review" doctrine. This doctrine was discussed at length in *Southern Pacific Terminal* cited *supra*, at page 515, 31 S.Ct. at page 283 where the plaintiff sought to have declared illegal an order of the Interstate Commerce Commission. There the Court quoted from the rule announced in *United States v. Trans-Missouri Freight Association*, 166 U.S. 290 at 308, 17 S.Ct. 540 at 546, 41 L.Ed. 1007. The Court said:

"Private parties may settle their controversies at any time, and rights which a plaintiff may have had at the time of the commencement of the action may terminate before judgment is obtained or while the case is on appeal, and in any such case the Court being informed of the facts would proceed no further in the action. Here, however, there's been no extinguishment of the rights ... of the public, the enforcement of which the government has endeavored to procure by the judgment of a court under the provisions of the act of Congress ... The defendants cannot foreclose these rights nor prevent the assertion thereof by the government as a substantial trustee for the public under the act of Congress by any such action as has been taken in this case."

The Court again discussed the "capable of repetition yet evading review" doctrine in *Super Tire Engineering Co. v. McCorkle*, 416 U.S. 115, 94 S.Ct. 1694, 40 L.Ed.2d 1 (1974) where the Court stated at pages 125 and 126, 94 S.Ct. at pages 1699 and 1700:

"It is sufficient, therefore, that the litigants show the existence of an immediate and definite governmental action or policy that was adversely affected and continues to affect a present interest. Otherwise (the policy at issue) could be adjudicated only rarely and the purposes of the ... Act, would be frustrated."

After citing numerous cases where the Court rejected claims of mootness, the Court emphasized:

"The important ingredient in this cases was governmental action directly affecting, and continuing to affect the behavior of citizens in our society." *See Super Tire* at page 126, 94 S.Ct. at page 1700.

This case I find falls squarely within the "capable of repetition yet evading review" doctrine as explained in these cases. Were a final judgment on the constitutionality of CICA to be evaded by the Comptroller General's dismissal of the protest, the constitutionality of CICA would most likely never be finally adjudicated. Under the provisions of CICA the Comptroller General must render a decision on the protest in 90 days. This makes it nearly impossible for a Court to render a final decision on the constitutionality of the stay provision before the protest is dismissed.

While the nature of the CICA procedures make it difficult, if not impossible, to finally adjudicate their constitutionality before

the review provision is completed, the policy of the Executive Branch not to follow some of the CICA provisions is clearly capable of repetition. As I discussed in my earlier opinion and I will discuss, *supra*, it is the policy of the Executive Branch to instruct all administrative agencies not to comply with the CICA provisions that I explicitly held to be constitutional. As I noted in my prior opinion, the procedures mandated under CICA could potentially effect the process of bid protest for something in the range of *$168 billion,* the amount of government contracts awarded in 1983 which Congress attempted to bring under a more competitive bidding structure. The Executive Branch's action in directing noncompliance with CICA is "governmental action directly affecting and continuing to affect the behavior of citizens in out society" and if the issue is not adjudicated, the purposes of the Act are frustrated. *See Super Tire Engineering, supra.*

Before turning to the parties' cross-motions for summary judgment as to the constitutionality of the Act, I would like to address a few preliminary matters.

The House intervenors have asked that this Court affirm its jurisdiction in this case to decide the legal issue before it. While this Court always notes whether or not it has jurisdiction before proceeding further on any issue, this is an unusual request in a case such as this where the basis for this Court's jurisdiction is clear and straightforward.

I find the House's request to be warranted, however, in light of the novel approach that the Executive Branch has taken in this case to deliberately determine to disobey portions of the law passed by Congress and signed by the President of the United States.

In reviewing the position of the Executive Branch in events both before and after my March 27th decision, I am forced to conclude that the fundamental role of this Court in stating what the law is has now been challenged by the Executive Branch. Almost as disconcerting as the facts of such a confrontation, which I find to be grievous, is the fact that the Executive Branch has mounted this assault elsewhere rather than in filings submitted to this Court.

In order to fully relate the extent of this attack, I repeat some of the background contained in my earlier opinion. When President Reagan signed CICA into law he "objected to certain provisions that would unconstitutionally attempt to delegate to the Comptroller General ... duties and responsibilities ... which may be performed only by officials of the Executive Branch." 20 Weekly Compilations Presidential Documents, Page 1027, July 18, 1984. The President "instructed the Attorney General to inform all Executive Branch agencies as soon as possible with respect to how they may comply with the provisions of this bill in a matter consistent with the Constitution."

On December 17, 1984, the Honorable David Stockman, Director of the Office of Management & Budget (OMB) issued Bulletin No. 85–8 entitled *Procedures Governing Implementation of Certain Unconstitutional Provisions of the Competition in Contracting Act of 1984,* hereinafter designated as "The Unconstitutionality Bulletin," which explained that the Executive Branch had decided that CICA was unconstitutional. Although both houses of Congress had duly passed the law and CICA had become law upon the signature of the President, the *Unconstitutionality Bulletin* commanded not merely that the Executive Branch present *views* opposing the statute, but that all agencies carry out the Executive Branch's *decision* that the Act was unconstitutional. Over strenuous congressional protest, the Executive Branch continually reaffirmed its view that the Executive possessed the power to *decide* statutes unconstitutional.

The Executive's position is that there is no difference between merely offering a *view* that a statute is unconstitutional (such as by declining to defend the statute in a court challenge) and *deciding* that a law is unconstitutional. See, for example, the letter of February 22, 1985 from Attorney

General William French Smith to the Honorable Peter Rodino, Jr. when the then Attorney General stated that "the Executive Branch's decisions not to execute or not to defend a statute are inextricably intertwined."

The Acting Deputy Attorney General then testified before the House Committee on Governmental Operations on March 7, 1985, that "the President's duty faithfully to execute the laws requires him not to observe a statute that is in conflict with the Constitution, the fundamental law of the land."

See "Testimony of D. Lowel Jensen, reprinted in a volume entitled *Constitutionality of GAO's Bid Protest Function, Hearings Before a Subcommittee of the House Commission on Government Operations*, 99th Congress, 1st Session (1985) at pages 302 and 318.

In April of this year, the Attorney General of the United States, the Honorable Edwin Meese, III, again so testified before the House Committee on the Judiciary, and again in April, again so stated in a public letter to the New York Times, (see the letter of May 21st, 1985, entitled "President's Right to Challenge a Law"), which the House intervenors have attached to their brief.

The present Attorney General has specifically assailed the jurisdiction of this Court in this case. In testimony on April 18, 1985, before the House Committee on the Judiciary, Attorney General Meese stated that this Court's decision of March 27 was not being followed because the Executive Branch was waiting until a court competent to decide the constitutionality of the law had decided the issue.

█ Such a position by the Executive Branch, I find, flatly violates the express instruction of the Constitution that the President shall "take care that the Laws be faithfully executed." *United States Constitution* Article II, Section 3. It has been one of the bedrocks of our system of government that *only* the Judiciary has the power to say what the law is. See *Mar-*

*bury v. Madison*, 5 U.S. (1 Cranch) 137, 177, 2 L.Ed. 60 (1803).

The Executive Branch's position that they can say when a law is unconstitutional equates the powers of mere executive officials with those of the Judiciary. It flies in the face of the basic tenet laid out so long ago by the United States Supreme Court in *United States v. Lee*, 106 U.S. (16 Otto) 196 at Page 220, 1 S.Ct. 240 at 260, 27 L.Ed. 171 (1882). The Court said, "No man in this country is so high that he is above the law. No officer of the law may set that law at defiance, with impunity. All the officers of the Government, from the highest to the lowest, are creatures of the law and are bound to obey it."

The rule that no executive official can decide for himself what laws he is bound to obey, but must await decisions of the Judiciary and until then must obey the laws, has deep roots in our constitutional history. As explained in Mr. Tiefer's presentation to the House, which is in the House Hearings Bulletin previously cited at page 257. During the reign of absolute British monarchs, the notion that the Executive, at the time the King, could decide for himself, without a decision of the courts, which laws should be obeyed was put to the test.

As Mr. Tiefer correctly noted, "After the Restoration, King James II attempted to claim such authority, but the English people would no longer tolerate such a claim, and their judicial system rejected it in the historic *Seven Bishops Case* of 1688.

"Shortly thereafter, James II was forced into exile in the Glorious Revolution of 1689, and the English Bill of Rights was enacted. The first article of that historic charter of freedom declared 'That *the pretended power of Suspending of Laws*, or the *Execution of Laws by Regal Authority*, without Consent of Parliament *is Illegal.'* Scholars have concluded that the 'faithful execution' clause of our Constitution is a mirror of the English Bill of Rights' abolition of the suspending power,' that is, the abolition of what the English Bill of Rights had called 'the pretended (Royal) power of Suspending' …

"In fact, the Constitutional Convention in 1787 expressly rejected the attempt to re-introduce some power for the President to decide to suspend the execution of laws. In that summer of 1787 Mr. Elbridge Gerry, a Delegate, observed, after a proposal was made at the Philadelphia Convention, "that the national executive have a power to suspend any legislative act ..." He noted, "that the power of suspending might do all the mischief dreaded from the novative of useful laws (i.e., the President's veto), without answering the salutary purpose of checking unjust or unwise ones."

The Constitutional Convention, I note, rejected the proposal. "Mr. Tiefer noted, "If the Framers had intended to give the President any such awesome power of deciding the constitutionality of laws as they gave to the Judiciary, there clearly would have been a clear record of it. Yet Alexander Hamilton, who discussed in detail the authority of the Judiciary to decide the constitutionality of laws, provided no such discussion of the supposedly equivalent Presidential power.

"Any possible doubt about the matter was resolved in the historic case of *Kendall v. United States*, 37 U.S. (12 Pet) 524, 9 L.Ed. 1181 (1838). There, a Cabinet Member claimed that because he was subject to the President, who, in turn, supposedly derived a vast power from the 'faithful execution' clause, he was not bound by the laws.

"The Supreme Court utterly rejected any such argument of Executive supremacy. The Supreme Court said that 'to contend, that the obligation imposed on the President to see the laws faithfully executed, implies a power to forbid their execution, is a novel construction of the constitution, and entirely inadmissible.'

"That Court," Mr. Tiefer noted, "harkened directly back to the classic language of the English Bill of Rights, and the Framers in a Constitutional Convention, in rejecting Executive power to 'forbid [the] execution' of the laws.

"In rejecting the Executive's argument, the Court explained that the effect of such power would be the 'vesting in the President [of] a dispensing power, *which has no countenance for its support, in any part of the constitution;* [such an argument is] asserting a principle, which, if carried out in its results, to all cases falling within it, would be *clothing the President with a power entirely to control the legislation of Congress, and paralyze the administration of justice."*

More recently the Supreme Court re-affirmed the distinction between the Executive Branch's right to express *views* on the constitutionality of a law and the Judiciary's right to decide the constitutionality in *Immigration & Naturalization Service v. Chadha*, 462 U.S. 919, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983).

I thus reject any attempt to characterize this Court as incompetent to make binding decisions of constitutional law and I order all parties, specifically the Executive Branch, to follow any ruling I make in this case in this district in which I am sitting. And that refers also to the Honorable Casper A. Weinberger and the Honorable David Stockman.

I, and the members of the Executive Branch of the Government, have taken an oath to execute and fulfill the duties of our offices according to the Constitution and laws of the United States. I believe I adhered to that oath and I would expect no less from members of the Executive Branch of the Government, regardless of what their station is within that Branch.

I order them to uphold that oath with respect to following this Court's order, which remains legally viable in this district until overruled by an appellate court.

I now turn to the parties' cross-motions for summary judgment as to the constitutionality of the act.

■ Defendants rely on the arguments submitted in opposition to the motion for preliminary injunction and supplement those arguments with additional case law discussing the position of the Comptroller General. Defendants continue to assert

that the Comptroller General is part of the Legislative Branch.

I have carefully reviewed defendants' additional theories as to why the Comptroller General cannot constitutionally carry out the duties assigned to that office under the Competition in Contracting Act and find them to be as unpersuasive now as I found them on the motion for preliminary injunction. United States Supreme Court case law clearly distinguishes the unconstitutionality of giving legislative officers executive duties from the constitutionality of giving executive officers legislative powers. See, for example, *Springer v. Philippine Islands,* 277 U.S. 189 at 202, 48 S.Ct. 480 at 482, 72 L.Ed. 845 (1928); *Buckley v. Valeo,* 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659.

I found that the appointment of the Comptroller General by the Executive allows the Comptroller General to exercise these duties which are statutorily assigned to him, whether they be executive and/or legislative in nature.

I do not find it necessary to repeat my entire analysis of the law for purposes of this motion. For the reasons I stated in my opinion of March 27, 1985, I find Title 31, U.S.C. Section 3553(d)(1) to be constitutional. The plaintiff intervenor's motion for summary judgment on this issue is accordingly granted, and that of the defendants is denied.

 Lastly, I turn to the defendants' motion to dissolve the preliminary injunction. Motions to dissolve an injunction are addressed to the sound discretion of the district court. See *Securities and Exchange Commission v. Warren,* 583 F.2d 115 (3d Cir.1978). Where, however, a final judgment has been entered on the merits, the preliminary injunction comes to an end and is superseded by the final order.

A preliminary injunction is by its very nature interlocutory, tentative and impermanent. See, *Hamilton Watch Co. v. Benrus Watch Co.,* 206 F.2d 738 at 742 (2d Circuit 1953). The preliminary injunction is, therefore, superseded by my final judgment on the merits that the stay provisions in CICA are constitutional.

Thus, my interlocutory order that the CICA stay provisions are constitutional and that they must be followed is now a final order that they are constitutional and must be followed.

I specifically note that the preliminary injunction has only been dissolved because it has been superseded by a final order.

As there are two separate issues for appeal here, my ruling on the constitutionality of the CICA provisions and my ruling of the denial of Ameron's bid, I am entering two separate orders here today with respect to this matter.