BURNS, Trustee, et al., Appellees,

v.

DAILY, Appellant.

[Cite as *Burns v. Daily* (1996), 114 Ohio App.3d 693.]

Court of Appeals of Ohio,
Eleventh District, Trumbull County.

No. 95–T–5259.

Decided Oct. 28, 1996.

694

*Mark S. Colucci*, for appellees Peter E. Burns and Delbert E. Strawder.

*Douglas J. Neuman*, for appellees Margaret S. Rudy, Douglas J. Neuman, and George Valtas.

*Sidney N. Freeman*, for appellant.

NADER, Judge.

This is an appeal from the judgment of the Probate Division of the Trumbull County Court of Common Pleas, finding defendant-appellant, John A. Daily, a licensed attorney, guilty of wrongfully concealing assets from a probate estate under R.C. 2109.50.

The litigation giving rise to the present action began roughly seven and one-half years ago. On February 14, 1989, a petition was filed in the Trumbull County Probate Court requesting the appointment of a guardian to oversee the financial affairs of Margaret S. Rudy ("Mrs. Rudy"). On April 20, 1989, the probate court entered an order appointing attorney Robert Vesmas as guardian *ad litem.* On June 19, 1989, the probate court entered another order prohibiting the transfer of Mrs. Rudy's assets during the pendency of the guardianship until final determination on her competency. After hearing, the probate court found that Mrs. Rudy had made certain financial transactions that were "against her best interests." It imposed a limited guardianship over her by order dated May 8, 1990. On June 13, 1990, the probate court reappointed attorney Vesmas as guardian.[1] This order described Mrs. Rudy as "incapacitated." Mrs. Rudy appealed this determination, and hired Daily to represent her in this court.

It appears that sometime in July 1989, Mrs. Rudy sold over $300,000 worth of stocks without the approval of either the guardian or the probate court. The proceeds were deposited into various bank accounts in Pennsylvania and West Virginia. During the time when Daily would have been prosecuting Mrs. Rudy's appeal before this court, there were incremental cash withdrawals of about $9,000 each. The withdrawals continued until the bank accounts were depleted in November 1990.

On August 26, 1991, we affirmed the probate court's determination that Mrs. Rudy was incompetent. *In re Guardianship of Rudy* (Aug. 23, 1991), Trumbull App. Nos. 90–T–4398 and 90–T–4416, unreported, 1991 WL 163443. We held that, although the probate court never actually described Mrs. Rudy as "incompetent" in its orders establishing the guardianship and appointing the guardian, its finding that Mrs. Rudy was "incapacitated" substantially complied with the requirement that it find an alleged incompetent to be "so mentally impaired * * * that he is incapable of taking care of himself or his property" under R.C. 2111.01(D).

---

1. The probate court initially appointed Daily to serve as the guardian, but withdrew the appointment after Daily indicated that he was representing Mrs. Rudy in an appeal of the probate court's determination of incompetency.

Mrs. Rudy switched attorneys and appealed again, but died shortly before her case was argued in the Supreme Court of Ohio. Upon her death, plaintiff-appellee, Peter E. Burns, was appointed trustee of a testamentary trust created by Mrs. Rudy in a living will dated January 2, 1992. Burns and plaintiff-appellee, Delbert E. Strawder, are the sole beneficiaries of this trust.

On December 11, 1992, the Supreme Court of Ohio issued its opinion reversing the judgment of this court. *In re Guardianship of Rudy* (1992), 65 Ohio St.3d 394, 604 N.E.2d 736. The Supreme Court of Ohio invalidated the letters of appointment on the ground that, while the probate court found Mrs. Rudy to be "incapacitated," there technically was no formal finding of incompetency. Because Mrs. Rudy had died, the Supreme Court of Ohio ordered her assets turned over to her estate.

On January 31, 1995, Burns and Strawder filed this action in the Trumbull County Probate Court under the authority of R.C. 2109.50 to recover certain "probate assets" in which they were allegedly interested. The complaint claimed that Daily took excessive legal fees in an unspecified amount during his representation of Mrs. Rudy before this court during her first appeal. On March 7, 1995, Daily filed a motion for judgment on the pleadings pursuant to Civ.R. 12(C), arguing in an attached memorandum that the probate court lacked subject-matter jurisdiction. Burns and Strawder did not reply. On March 17, 1995, the probate court denied Daily's motion.

The probate court held a bench trial on this matter on March 21, 1995 through April 7, 1995. At trial, both Burns and Strawder testified that Mrs. Rudy instructed them to withdraw the cash from the Pennsylvania and West Virginia banks, and that they personally paid these withdrawals directly to Daily as compensation for his legal services in bringing Mrs. Rudy's appeal and for other legal services.[2] Burns and Strawder alleged that, in all, Daily took over $300,000 for these services.

At the close of Burns and Strawder's case-in-chief, Daily moved for dismissal under Civ.R. 41 for failure to establish all the elements of a prima facie case and for failure to establish facts necessary to prove subject-matter jurisdiction. The probate court denied the motion. It subsequently found Daily guilty of withholding probate assets, and ordered him to pay (1) $324,967.97 to Mrs. Rudy's estate, (2) a statutory ten-percent penalty thereon amounting to $32,496.80, (3) prejudgment interest in the amount of $165,788.11, (4) postjudgment interest, (5) costs, and (6) attorney fees.

---

**2.** Daily formed a corporation for Mrs. Rudy, to which she transferred nine rental properties during the pendency of the guardianship.

Daily prematurely filed a notice of appeal before the probate court entered its findings of fact and conclusions of law. By order of this court dated August 30, 1995, this notice of appeal was treated as filed immediately after the probate court entered those findings pursuant to App.R. 4(C).

Daily submits six assignments of error for our review:

"1. The trial court erred, as a matter of law and to the prejudice of the defendant by ruling it had subject-matter jurisdiction over the proceedings below.

"2. The trial court erred, as a matter of law and to the prejudice of appellant when it [failed] to dismiss the plaintiffs' claims for insufficiency to state a cause of action under Ohio Rev.Code Sec. 2109.50.

"3. The trial court erred, as a matter of law and to the prejudice of appellant by allowing the proceedings to continue under deficient notice and other circumstances that prevented appellant from obtaining a fair trial under the Fifth, Sixth and Fourteenth Amendments of the United States Constitution, and comparable provisions of the Ohio Constitution.

"4. The trial court erred as a matter of law and to the prejudice of appellant, by not taking judicial notice of the fact that it already had released appellant from the claims alleged against him below.

"5. The trial court erred, as a matter of law and to the prejudice of the appellant, by refusing to permit the testimony of his polygraph expert.

"6. The trial court erred, as a matter or law and to the prejudice of appellant, when it failed to rule there was not a scintilla of evidence to prove there had been a concealment of assets from a trust estate."

■ Because "[i]t is axiomatic that courts will resolve questions of subject matter jurisdiction prior to determining the merits of a controversy," *Hitt v. Tressler* (1983), 4 Ohio St.3d 174, 175, 4 OBR 453, 454, 447 N.E.2d 1299, 1300, we turn first to Daily's arguments that the probate court lacked subject-matter jurisdiction.

■ The probate court determined that it had subject-matter jurisdiction on two separate occasions. First, it overruled Daily's motion for judgment on the pleadings. Second, it overruled Daily's motion for dismissal on the ground that Burns and Strawder had failed to establish subject-matter jurisdiction at the close of their evidence. It is not clear from Daily's brief from which of these decisions he now appeals. Although this ambiguity would ordinarily preclude our consideration of the assignment of error, see App.R. 12(A)(2) (failure to clearly identify errors in the record), the issue of a possible lack of subject-matter jurisdiction presents a special question. It may be raised for the first time on appeal. *Jenkins v. Keller* (1966), 6 Ohio St.2d 122, 35 O.O.2d 147, 216 N.E.2d

379, paragraph five of the syllabus. Further, an appellate court may *sua sponte* consider whether the trial court possessed the power to entertain an action, even where the litigants themselves fail to raise the issue. See *Fox v. Eaton Corp.* (1976), 48 Ohio St.2d 236, 2 O.O.3d 408, 358 N.E.2d 536, overruled on other grounds *Manning v. Ohio State Library Bd.* (1991), 62 Ohio St.3d 24, 577 N.E.2d 650. Under these principles, we think it appropriate to proceed despite the uncertainty in Daily's brief.

We first examine the probate court's denial of Daily's motion for judgment on the pleadings, as this motion forced it to determine its power to hear this case early in the litigation and before substantive evidence was introduced. We read the complaint, the only pleading filed in the case, to allege that Daily performed legal services, that Mrs. Rudy paid an amount of money for those services, that Burns and Strawder believed this amount to be excessive, that these monies still belonged to the estate, and that Daily was in possession of them.[3] The second cause of action alleges that Daily violated previous orders of the probate court. Based on these allegations, the probate court determined that it had subject-matter jurisdiction and, accordingly, denied Daily's motion for judgment on the pleadings.

"The existence of the court's own subject-matter jurisdiction in a particular case poses a question of law which the court has the authority and the responsibility to determine." *Internatl. Lottery, Inc. v. Kerouac* (1995), 102 Ohio App.3d 660, 670, 657 N.E.2d 820, 826, citing *State ex rel. Connor v. McGough* (1989), 46 Ohio St.3d 188, 189–190, 546 N.E.2d 407, 408–410. We review that determination *de novo*, without any deference to the conclusion reached below. In so doing, we are to keep in mind that the complainant in a proceeding to discover assets bears the burden of demonstrating that the subject matter of his

---

3. In the first cause of action against Daily, the complaint reads in part:

"10. Plaintiffs say that during the last four (4) years of the decedent's [Mrs. Rudy's] life that defendant, John A. Daily ('Daily') served as attorney for the decedent in a contested guardianship before this court and in other matters. During that tenure of service, defendant Daily wrongfully obtained by fraud, deceit and/or coercion, an excessive amount of assets from the decedent claiming that the decedent owed defendant such amounts for legal services.

"11. Upon a review of assets in the Estate of Margaret S. Rudy and based upon investigation into missing assets[,] complainants have probable cause to believe and therefore aver that the defendant, John Daily, has improperly obtained and continues to hold assets belonging to Margaret S. Rudy, deceased."

There is no further description of these "missing assets." The only allegation in the complaint stated with any particularity is that Daily took excessive legal fees. Under Civ.R. 9(B), allegations of fraudulent conduct must be plead with more specificity than in other types of actions. The rule applies to actions brought under R.C. 2109.50, as the assertion that a person has conveyed away or concealed assets is tantamount to an allegation of fraud perpetrated on the probate court. Therefore, we limit our reading of the complaint only to those allegations stated with particularity.

complaint lies within the contemplation of R.C. 2109.50. *In re Estate of Fife* (1956), 164 Ohio St. 449, 456, 58 O.O. 293, 297, 132 N.E.2d 185, 190. Thus, our task is to independently determine if Burns and Strawder have satisfied that burden by stating in the complaint a cause of action that could have been heard by the probate court as in proceedings for concealment of assets.

■ A probate court is a court of limited jurisdiction, and may entertain only those types of actions which the General Assembly permits. *Schucker v. Metcalf* (1986), 22 Ohio St.3d 33, 34, 22 OBR 27, 28, 488 N.E.2d 210, 212.

R.C. 2109.50 provides:

"Upon complaint made to the probate court of the county having jurisdiction of the administration of a trust estate or of the county wherein a person resides against whom the complaint is made, by a person interested in such trust estate or by the creditor of a person interested in such trust estate against any person suspected of having concealed, embezzled, or conveyed away or of being or having been in the possession of any moneys, chattels, or choses in action of such estate, said court shall, by citation, attachment or warrant, or, if circumstances require it, by warrant or attachment in the first instance, compel the person or persons so suspected to forthwith appear before it to be examined, on oath, touching the matter of the complaint."

■ This section confers upon the probate court jurisdiction to conduct summary proceedings to discover and retrieve specific property or the proceeds or value thereof that belong to a trust estate. *In re Estate of Black* (1945), 145 Ohio St. 405, 31 O.O. 31, 62 N.E.2d 90, paragraph one of the syllabus. The statute may not be used as a substitute for an action in the general division of the common pleas court to collect a debt due a decedent, for an accounting and judgment for any balance found due, or to adjudicate rights under a contract. *In re Estate of Leiby* (1952), 157 Ohio St. 374, 47 O.O. 265, 105 N.E.2d 583, paragraph one of the syllabus.

■ In order for an asset to belong to a probate estate, title·to the asset must rest in the decedent upon her death. See, *e.g., Black, supra; Leiby, supra.* If title to personal property resides in the decedent upon her death, title to that property passes over to the executor or administrator of the estate, *Winters Natl. Bank & Trust Co. v. Riffe* (1965), 2 Ohio St.2d 72, 77, 31 O.O.2d 56, 58, 206 N.E.2d 212, 216, and the property can be properly considered "probate property" subject to a discovery proceeding under R.C. 2109.50. See, *e.g., Fecteau v. Cleveland Trust Co.* (1960), 171 Ohio St. 121, 12 O.O.2d 139, 167 N.E.2d 890; *In re Estate of Popp* (1994), 94 Ohio App.3d 640, 641 N.E.2d 739; *Lauerman v. Destocki* (1993), 87 Ohio App.3d 657, 622 N.E.2d 1122. If, on the other hand, title does not reside in the decedent upon her death, but passed to a third party by

*inter vivos* transaction or gift, then such property may not be included as an estate asset, and may not be retrieved by a summary proceeding in the probate court. See, *e.g., In re Estate of Sexton* (1955), 163 Ohio St. 124, 56 O.O. 178, 126 N.E.2d 129; *Goodrich v. Anderson* (1940), 136 Ohio St. 509, 17 O.O. 152, 26 N.E.2d 1016; *McMahan v. Jones* (App.1934), 17 Ohio Law Abs. 488; *Black, supra; Leiby, supra.* Thus, "[i]n the final analysis the question of title is the ultimate question to be determined." *Smith v. Ross* (App.1939), 29 Ohio Law Abs. 553, 557.

In the instant matter, the complaint alleges that Mrs. Rudy hired Daily to perform legal services, and that she paid him the money in question pursuant to this agreement before she died. The rule in Ohio, and in virtually all other jurisdictions, is that title to money paid pursuant to a contract for personal services passes over to the payee upon payment. *State v. Focks* (C.P.1950), 59 Ohio Law Abs. 397, 44 O.O. 21, 97 N.E.2d 557 (defendant could not be convicted of conversion for being in possession of money paid to him under a contract to build a house because "the title to said money was transferred to the defendant in compliance with the terms of [the] building contract"); 54 American Jurisprudence 2d (1971) 554, Money, Section 6. See, also, *Jenkins v. Mapes* (1895), 53 Ohio St. 110, 116, 41 N.E. 137, 138. Therefore, title to the money passed out of Mrs. Rudy on those dates when she allegedly paid Daily pursuant to the contract.[4] Because title was not lodged in Mrs. Rudy upon her death, nothing passed to her executor, and the money did not become an asset of her estate. Consequently, Burns and Strawder could not bring, and the probate court had no authority to hear, an action under R.C. 2109.50 to recover it. At first blush, it would appear that the very face of the complaint belies the probate court's authority to hear this matter, and that Burns and Strawder actually negated their own claim of jurisdiction.

---

4. The probate court apparently viewed a contract for legal services to be different from a contract for any other kind of services. It cited *Cleveland Bar Assn. v. Kurtz* (1995), 72 Ohio St.3d 18, 647 N.E.2d 150, *Cincinnati Bar Assn. v. Schultz* (1994), 71 Ohio St.3d 383, 643 N.E.2d 1139, and *Toledo Bar Assn. v. Lubitsky* (1992), 63 Ohio St.3d 669, 590 N.E.2d 746, for the proposition in its judgment entry that "[a]n attorney is not entitled to fees until services are performed for the client." These cases deal with the Code of Professional Responsibility, and do stand for the notion that attorneys may be subject to discipline for taking fees without doing legal work, DR 2–110(A)(3), and for overcharging, DR 2–106(A). However, they do not address the question whether title to the money passes over to the attorney upon payment, even though the payment exceeds what should have been charged. We agree that $300,000 is an exorbitant amount of money to charge to prosecute a single appeal, but the internal professional regulations imposed on the conduct of practicing attorneys do not hinder the operation of legal principles generally applicable to everyone. If a client pays too much to an attorney, title to the money still passes. Just because the Supreme Court of Ohio has decided to punish the attorney for such conduct does not prevent all the normal legal consequences attending this transaction from taking effect.

 If the allegations in the complaint are true, and Daily did take excessive attorney fees, then an action would lie against him to recover the balance on a theory of breach of contract, breach of fiduciary duty, money had and received, an accounting, conversion, fraudulent misrepresentation, or the like. Mrs. Rudy's right to bring such an action constituted a chose in action, which she held as personal property. *In re Estate of McQueen* (P.C.1963), 4 Ohio Misc. 65, 69, 32 O.O.2d 210, 213, 210 N.E.2d 157, 160. When she died, it passed to her executor. See *In re Wreede* (1958), 106 Ohio App. 324, 7 O.O.2d 75, 154 N.E.2d 756 (contractual right to be paid becomes an asset of the estate); R.C. 2115.02 (inventory of the estate includes all rights of decedent); R.C. 2115.09. Like any other piece of personal property, the executor must reduce it to cash, in this case by reducing the chose in action to a money judgment. R.C. 2113.25; *Young v. Roberts* (1892), 7 Ohio C.C. 105, 106, affirmed (1896), 54 Ohio St. 622, 47 N.E. 1119 (duty to collect assets means duty to reduce personal property to cash). These actions, however, must be pursued in the general division of the court of common pleas, for the probate court has no jurisdiction over them. See *Alexander v. Compton* (1978), 57 Ohio App.2d 89, 11 O.O.3d 81, 385 N.E.2d 638 (probate court has no jurisdiction over any claim for money damages resulting from fraud); *In re Estate of Stutz* (1964), 1 Ohio App.2d 188, 30 O.O.2d 212, 204 N.E.2d 248 (probate court has no jurisdiction to entertain an action by estate to collect moneys allegedly owing the estate on promissory notes).

Notwithstanding the foregoing analysis, there are several unusual circumstances surrounding this case that bear on the issue of the probate court's jurisdiction. Indeed, it appears from reading the probate court's findings of fact and conclusions of law filed after trial that it relied on several of these unusual circumstances to support its assertion of jurisdiction. We also believe they merit consideration, and will examine them to determine whether any such circumstance alters our original conclusion.

The first of these unusual circumstances is the apparent existence of the guardianship over Mrs. Rudy's assets established by order of the probate court dated May 8, 1990. Indeed, the probate court below relied partially on the existence of the guardianship as a basis on which to predicate jurisdiction.

 When, on December 11, 1992, the Supreme Court of Ohio finally ruled on the matter, it determined that the letters of appointment were improperly issued due to a lack of a formal finding of incompetency. *In re Guardianship of Rudy* (1992), 65 Ohio St.3d 394, 396, 604 N.E.2d 736, 737. The ruling undoubtedly terminated the guardianship from that point forward. R.C. 2111.47 (guardianship terminates upon determination that letters of appointment were improperly issued). Ordinarily, a reversal of a judgment on appeal nullifies the judgment below, leaving the case standing as if no judgment had been rendered.

*Moore v. N. Am. Van Lines* (1995), 319 S.C. 446, 447, 462 S.E.2d 275, 276; *LeBleu v. Jim Murphy & Assoc., Inc.* (Miss.1990), 557 So.2d 526, 529; *Franklyn Gesner Fine Paintings, Inc. v. Ketcham* (1989), 259 Ga. 3, 3, 375 S.E.2d 848, 849. In the context of a direct appeal of an order appointing a guardian, this means that, upon reversal, the order should be invalid from its inception. Cf. *In re Estate of Witteman* (1969), 21 Ohio St.2d 3, 50 O.O.2d 2, 254 N.E.2d 345, paragraphs six and seven of the syllabus.

However, some of the language in the Supreme Court's opinion makes it difficult to interpret its effect upon the guardianship existing prior to the decision. After holding the letters of appointment to be improperly issued, the Supreme Court proceeded to address the validity of certain actions taken by the guardian during the pendency of the appeal:

"Further, we are not in a position to examine all actions taken by the guardian with a view to either voiding them or confirming them. The law does not require us to do so. The order of a probate court appointing a guardian cannot be collaterally impeached. *Shroyer v. Richmond* (1866), 16 Ohio St. 455, paragraph seven of the syllabus; *Union Savings Bank & Trust v. Western Union* (1908), 79 Ohio St. 89, 86 N.E. 478, paragraph two of the syllabus; cf. R.C. 2113.23 (pertaining to executors and administrators). Actions taken by a guardian, therefore, are under color of law, and may be upheld even where the guardian's authority is successfully challenged." *Rudy*, 65 Ohio St.3d at 396, 604 N.E.2d at 738.

■ This passage, which appears to validate some of the actions taken by a guardian where the guardianship itself is subsequently overturned on appeal, is puzzling because the *Shroyer* and *Union Savings* cases, although cited, do not support the Supreme Court's conclusion.[5] These cases dealt with collateral attacks on an order appointing a guardian brought in subsequent actions. The

---

5. In fact, these cases stand for principles diametrically opposed to the Supreme Court's reasoning. In *Shroyer*, a second guardian sued the sureties of the first guardian in order to recover $1,607 rightfully belonging to the ward, but remaining in the hands of the first guardian. The sureties defended on the theory that the first guardian was improperly appointed. The court held that the order appointing the first guardian could not be collaterally impeached, unless and until the final order of appointment is "set aside or reversed by a direct proceeding for that purpose." *Shroyer*, 16 Ohio St. at 466.

In *Union Savings*, the defendant wrongfully trespassed on the plaintiff's land and cut away some of the branches along an avenue of trees. Thereafter, the plaintiff died. The court appointed an administrator, who sued the defendant for the damages. In that second action, the defendant claimed that the administrator was incompetent to serve, and that the letters appointing him were invalid. The Supreme Court deflected the attack, holding that there could be no collateral attack on the order appointing the administrator where that order "stands unreversed and unmodified to this time." *Union Savings*, 79 Ohio St. at 99, 86 N.E. at 479. In the *Rudy* case, the Supreme Court reversed the order appointing the guardian, and yet cited *Union Savings* for the proposition that there could be no collateral attack on it.

*Rudy* case came to the Supreme Court on direct appeal. Historically, the courts in Ohio have held that a ward may challenge the order appointing a guardian by direct appeal on the ground that the letters of guardianship were in the first instance improperly issued. *Hiett v. Nebergall* (1888), 45 Ohio St. 702, 17 N.E. 558; *In re Guardianship of Reynolds* (1957), 106 Ohio App. 488, 7 O.O.2d 222, 155 N.E.2d 686. By relying on collateral immunity to preserve legal actions taken by a guardian where the guardianship is overthrown on direct appeal, the Supreme Court has needlessly disturbed formerly settled law.

We have no choice but to set aside our reservations regarding the legal basis of the Supreme Court's opinion. Dutifully, then, we focus on this passage because it may provide the probate court with jurisdiction over the issue of Daily's fees if the guardian took some action against him in that respect. Unfortunately, our inquiry forces us to delve deeper into the facts underlying the guardianship action.

Near the end of her life, Mrs. Rudy believed, for whatever reason, that her stockbroker and attorney were attempting to steal her life savings. She sought help from her church, and her pastor introduced her to Burns and Strawder in December 1988. Burns and Strawder convinced her to transfer some of her assets into their names for "safekeeping." On February 14, 1989, Mrs. Rudy conveyed her residence to Strawder.

Lloyd Tompkins, Mrs. Rudy's nephew, being understandably concerned over these events, filed an application to have a guardian appointed over her financial affairs. On April 20, 1989, the probate court appointed attorney Vesmas as her limited guardian *ad litem.* Immediately, Burns and Strawder attempted to close Mrs. Rudy's bank accounts, and tried to privately sell some of her real estate to other individuals. On May 3, 1989, attorney Vesmas moved the probate court for a temporary restraining order to prevent Burns and Strawder from transferring any other assets. In response, the probate court issued an order on June 19, 1989 restraining transfers of Mrs. Rudy's assets until a final determination on her competency.

Notwithstanding the freeze-assets order, Mrs. Rudy endorsed and delivered several hundred thousands of dollars worth of stock to Strawder on June 27, 1989. Additionally, Mrs. Rudy violated the June 19, 1989 order by transferring nine rental properties to Strawder and to a corporation that Daily had formed. Further, Mrs. Rudy opened several joint bank accounts giving Burns and Strawder access to her cash.

On October 29, 1990, attorney Vesmas requested the authority to retrieve his ward's assets, which he believed had been transferred to "third parties." Although no names are mentioned in the motion, it is clear that attorney Vesmas

sought to recover the stock and rental properties from Burns and Strawder. The motion was granted on June 13, 1991.

On December 17, 1991, attorney Vesmas filed a series of motions: (1) to treat the joint bank accounts held in the names of Rudy, Burns and Strawder, as belonging only to Mrs. Rudy; (2) to remove the endorsements on the backs of the stock certificates that Mrs. Rudy endorsed over to Strawder on June 27, 1989, in violation of the June 19, 1989 freeze-asset order, and an order to have the stock reissued in Mrs. Rudy's name alone; and (3) to reconvey title to rental properties into the guardianship estate. Attorney Vesmas also filed a motion to show cause why Daily should not be held in contempt of court for, among other things, (1) failing to provide an accounting to the court concerning stock dividends from Mrs. Rudy's brokerage accounts and (2) facilitating the transfer of the nine rental properties.[6]

On March 11, 1992, the probate court filed a judgment entry in response to Vesmas's December 17, 1991 motion to show cause against Daily finding him in contempt, and stipulating that he could purge himself of the contempt if he provided attorney Vesmas an accounting of the dividends and interest from Mrs. Rudy's brokerage accounts and a report explaining his involvement in the other transactions.

On April 3, 1992, Tompkins filed a motion alleging that Daily and Mrs. Rudy's second appellate attorney, former Judge Richard B. Metcalf, had both taken excessive and unapproved legal fees from Mrs. Rudy and requesting an order requiring them to return the money.

The probate court set a hearing for all the foregoing matters on April 10, 1992.

At that hearing, Daily apparently explained his role in the various transactions. He also provided an accounting of his legal fees, because the probate court entered a handwritten judgment entry indicating that Daily had purged himself of the contempt. As to Tompkins's motion regarding the fees of Daily and Metcalf, the judge entered a handwritten order stating only that attorney Metcalf was to return a coin collection in his possession. The judge granted attorney Vesmas's motions against Burns and Strawder, and took the matter of Daily's fees under advisement.

On April 20, 1992, the probate court entered an order approving the fees of various attorneys. As to Daily, the order deferred decision on whether his fees would be allowed until a hearing to be held June 29, 1992. Daily testified at the concealment hearing that the judge postponed the determination of the propriety

---

6. Daily prepared and filed the deeds which effectuated these real estate transfers.

of his fees until after the Supreme Court of Ohio had issued its ruling on Mrs. Rudy's competency.

Thus, the only action taken by the guardian against Daily was the motion to show cause why he should not be held in contempt of court. Daily purged himself of that contempt citation. The guardian never attempted to retrieve any funds from him. Therefore, the Supreme Court of Ohio's opinion upholding the acts of the guardian does not apply to the Rudy–Daily transactions. The probate court's authority over these transactions did not survive the termination of the guardianship; the probate court erred inasmuch as it predicated its exercise of jurisdiction in the present concealment action based on the mere prior existence of the guardianship.

The second unusual circumstance relates to the first. In its findings of fact and conclusions of law, the probate court indicated that it believed it possessed jurisdiction over the case at bar partially because of the existence of the outstanding freeze-asset order of June 19, 1989. This order, by its terms, restrains transfers of assets "until the final hearing on the application for the appointment of a guardian is held and the final determination of this Court is made, pursuant to Revised Code Section 2111.04." It was clearly designed to preserve the status quo until the issue whether a guardian should be appointed could be resolved. We therefore deem it to be, in substance, a preliminary injunction. See *Consun Food Indus., Inc. v. Fowkes* (1991), 81 Ohio App.3d 63, 69, 610 N.E.2d 463, 466 (purpose of preliminary injunction is to preserve the status quo until trial); *Gobel v. Laing* (1967), 12 Ohio App.2d 93, 94, 41 O.O.2d 175, 175, 231 N.E.2d 341, 342 (temporary injunctions are entered to preserve court's ability to grant effective relief on the merits).

Preliminary injunctions by their very nature are interlocutory, tentative, and impermanent; they are generally regarded as being superseded by a final judgment that is rendered on the merits in the underlying controversy. *Ameron, Inc. v. United States Army Corps of Engineers* (D.N.J.1985), 610 F.Supp. 750, 757, affirmed as modified (C.A.3, 1986), 787 F.2d 875. Preliminary injunctions are not enforceable after final judgment has been entered. *Indep. Am. Real Estate, Inc. v. Davis* (Tex.Civ.App.1987), 735 S.W.2d 256, 261.

In this case, the preliminary injunction of June 19, 1989 was superseded by the final order of May 8, 1990 granting the application to appoint a guardian. Thus, the preliminary injunction expired on that day. Therefore, it cannot possibly serve as a continuing basis to assert jurisdiction over Daily.

The third unusual circumstance is the probate court's express reservation of the issue of Daily's attorney fees until after the Supreme Court of Ohio's

ruling. The Supreme Court of Ohio's reversal of the order finding Mrs. Rudy to be incompetent eliminated its existence for most purposes, except as to those transactions Mrs. Rudy entered into with Burns and Strawder. In the absence of a valid judicial determination that a person is incompetent, there is a presumption of competency. See *Testa v. Roberts* (1988), 44 Ohio App.3d 161, 166, 542 N.E.2d 654, 660. Therefore, Mrs. Rudy was legally competent to hire Daily.[7] Without a valid order declaring her to be incompetent, how can it be said that Mrs. Rudy's actions are invalid? Because the guardianship was overthrown on direct appeal, Daily did not need, nor did he seek, the probate court's approval of his fees. Cf. *Unger v. Wolfe* (1938), 134 Ohio St. 69, 75, 11 O.O. 483, 486, 15 N.E.2d 955, 957 (matter of fees payable to attorney hired by ward to remove guardian is properly before the probate court only if guardianship survives the attempt). At most, the express reservation of the fees issue amounts to a reservation for *res judicata* purposes of a claim against Daily, which passed over to Mrs. Rudy's executor, and which must now be brought in the general division of the court of common pleas. The reservation in and of itself did not preserve the jurisdiction of the probate court.

Last, we note that Burns and Strawder presented evidence at trial that the transfers to Daily were not pursuant to the legal services contract, but were, in fact, designed to remove the cash from the reach of the probate court. They claimed that, pursuant to this conspiracy, in which, we note, Burns and Strawder actively participated by making deliveries, Daily was to merely hold the money until after the guardianship was overturned on appeal. If these allegations were contained in the complaint, then there would have been a question whether title in fact remained in Mrs. Rudy, and the court probably would have had jurisdiction to proceed to a hearing on the matter.

Admittedly, the pleadings could be impliedly amended to conform to the proof under Civ.R. 15(B), but we nevertheless reject this theory. Daily's motion for judgment on the pleadings forced the probate court to consider its jurisdiction before such proof was introduced. At that point, it should have been apparent from the face of the complaint that the probate court lacked subject-

---

7. We further note, with interest, that Mrs. Rudy's children and grandchildren, the beneficiaries of a will Mrs. Rudy executed in 1980, filed an action to contest the validity of her 1992 will leaving everything to Burns and Strawder. The gist of the complaint was that Mrs. Rudy was incompetent to make the 1992 will. On June 20, 1994, these parties agreed to settle the will contest action and to split Mrs. Rudy's estate between them. If the will contest action had proceeded, then our conclusion that Mrs. Rudy was legally competent to enter into a legal services agreement with Daily may have been undermined. But the will contest action never reached a determination of Mrs. Rudy's competency. Any further challenge to the soundness of her mind during the last few years of her life would also challenge the court's admission of her 1992 will to probate; hence, our holding that she was competent to hire Daily is enhanced.

matter jurisdiction to hear the within cause. Because we have determined that the complaint does not include sufficient allegations to support a finding of subject-matter jurisdiction, the probate court was without power to proceed. *Goodrich v. Anderson* (1940), 136 Ohio St. 509, 513, 17 O.O. 152, 154, 26 N.E.2d 1016, 1018 (probate court has no authority to proceed to a money judgment when it finds that the jurisdictional prerequisites have not been met). Any proceedings undertaken thereafter are void. *Hoerner v. Downs* (1989), 63 Ohio App.3d 286, 288, 578 N.E.2d 830, 831 ("If courts transcend the limits which the law prescribes, and assume to act where they have no jurisdiction, their acts are utterly void."). A party should not be permitted to rely on proof submitted in proceedings in a court utterly devoid of subject-matter jurisdiction to impliedly amend a facially defective complaint.

Having examined all possible theories of jurisdiction, we hold each to be inadequate to sustain the probate court's determination that it possessed the power to adjudicate the claims of Burns and Strawder. The probate court erred when it denied Daily's motion for judgment on the pleadings. In light of our conclusion, there is no need to consider whether the probate court should have granted the Civ.R. 41 motion to dismiss at the end of Burns and Strawder's case. Daily's first assignment of error has merit.

The disposition of the first assignment of error makes the others moot, and we will not consider them. App.R. 12(A)(1)(c).

The judgment of the probate court is reversed, and the cause is remanded with instructions to enter judgment on the pleadings for defendant-appellant, John A. Daily.

*Judgment accordingly.*

JOSEPH E. MAHONEY, P.J., and EDWARD J. MAHONEY, J., concur.

EDWARD J. MAHONEY, J., retired, of the Ninth Appellate District, sitting by assignment.