[Cite as *In re Creation of Park Dist. Within Chester Twp.*, 2017-Ohio-4031.]

# IN THE COURT OF APPEALS

## ELEVENTH APPELLATE DISTRICT

## GEAUGA COUNTY, OHIO

IN THE MATTER OF THE
CREATION OF A PARK
DISTRICT WITHIN
CHESTER TOWNSHIP

**O P I N I O N**

**CASE NO. 2016-G-0082**


Appeal from the Geauga County Court of Common Pleas, Probate Division, Case No. 84 PC 000139.

Judgment: Reversed and vacated.


*Frank H. Scialdone and Todd M. Raskin*, Mazanec, Raskin & Ryder Co., L.P.A., 100 Franklin=s Row, 34305 Solon Road, Solon, Ohio 44139; *Bridey Matheney*, Assistant Prosecutor, 231 Main Street, Suite 3A, Chardon, Ohio 44024 (For Appellant C Chester Township Board of Trustees).

*James M. Gillette*, City of Chardon Police Prosecutor, PNC Bank Building, 117 South Street, Suite 208, Chardon, Ohio 44024 (For Appellee C Chester Township Park District Board of Commissioners).


SEAN C. GALLAGHER, P.J., Eighth Appellate District, sitting by assignment.

{¶ 1} The core of this appeal is the extent of the probate court's jurisdiction over a judicially created park district under R.C. Chapter 1545. The probate court invoked its own continuing jurisdiction in a case initiated by the Chester Township Board of Trustees ("Trustees") in 1984 to create the Chester Township Park District ("Park District"). The central question, as framed by the parties, is whether the probate court maintained jurisdiction over the Trustees and the township as a political entity either through the

exercise of its plenary power to enforce the terms of the 1984 order creating the Park District or, otherwise, through the probate court=s continuing jurisdiction over the Park District as provided in R.C. Chapter 1545.

{¶ 2} The May 10, 1984 order creating the Park District did not impose any obligations or duties. It simply created the legal entity known as the Park District, established the territorial limits of the Park District, and noticed an intent to appoint the original Park District Board of Commissioners ("Commissioners"). There are no terms in that order to be enforced in perpetuity. *See, e.g., Am. Motors Corp. v. Huffstutler*, 61 Ohio St.3d 343, 349, 575 N.E.2d 116 (1991) (case remanded for further proceedings including the exercise of continuing jurisdiction in connection with enforcing the terms of a permanent injunction). Generally in Ohio, trial courts do not maintain the power, plenary or otherwise, to enforce the terms of a final order absent the grant of continuing jurisdiction or an express retention of jurisdiction in the final judgment. *See, e.g., Infinite Sec. Solutions, L.L.C. v. Karam Props. II*, 143 Ohio St.3d 346, 2015-Ohio-1101, 37 N.E.3d 1211, ¶ 30 (power to enforce settlement agreement must be expressly included in final judgment of dismissal); *In re Adams*, 45 Ohio St.3d 219, 543 N.E.2d 797 (1989) (although domestic relations court generally has continuing jurisdiction, statutory scheme does not include the continuing jurisdiction to modify alimony); *In re J.F.*, 121 Ohio St.3d 76, 2009-Ohio-318, 902 N.E.2d 19, ¶ 20. Because there was nothing to enforce in the order creating the Park District, the Park District has focused its entire argument on the statutory grant of continuing jurisdiction conferred on a probate court in matters involving a park district as the basis for the probate court's action.

**{¶ 3}** Based on the statutory framework, however, we must conclude that the probate court exceeded its jurisdiction by declaring portions of an arm's-length agreement entered under R.C. 1545.14 to be invalid and imposing the costs of the master commissioner, appointed to review the Commissioners' conduct, against an unrelated political entity. In light of the demonstrated confusion over a park district=s functions and the probate court's role within Chapter 1545, we must begin with the facts of this case as they relate to the statutory framework within which the Park District operates.

**{¶ 4}** Upon the creation of a park district, the probate court is required to appoint three commissioners to the board whose terms expire on a rotating basis for the first three years. R.C. 1545.05. Thereafter, each commissioner is appointed for a three-year term. *Id.* Judge Frank Lavrich created the Park District and appointed the first Commissioners on May 17, 1984. In the early years, the Trustees were responsible for soliciting volunteers and applications for the position of Commissioner, and the probate court accepted the Trustees' recommendation for filling any vacancy. In September 1993, Judge Charles Henry succeeded Judge Lavrich, and according to the record, Judge Henry followed his predecessor=s procedure. By July 2007, the probate court began taking applications for the position of Commissioner directly instead of filtering the applications through the Trustees.

**{¶ 5}** The creation of the Park District created a legal entity, separate and apart from the township. However, the creation of the Park District did not automatically transfer any land or property over which the Park District could assert control. R.C. 1545.14 expressly provides that a park district cannot acquire or control any park, park lands, parkways,

3

playgrounds, or other lands, or boulevards owned or controlled by any other public authority unless an agreement is reached between the park district and the public authority in possession of such lands. *Id.* In other words, the public authorities maintained their ownership interests in any park land within the territorial limits of the Park District after its creation. There is no statutory obligation for any public authority to cede ownership or control of its park lands to a park district. A park district does not have a purpose unless there are properties to be maintained, to be developed, or over which the park district could assume control. The legislature contemplated this possibility and provided for the dissolution of a park district after a prolonged period of inactivity. R.C. 1545.38 (upon notice that the park district has not made any expenditures or deposits of funds in five years, the district shall be dissolved). In order to avoid this situation, the legislature provided two mechanisms.

{¶ 6} A park district could purchase or acquire its own property. R.C. 1545.11. Under R.C. 1545.11, the commissioners could, but were not required to, acquire

> lands either within or without the park district for conversion into forest reserves and for the conservation of the natural resources of the state, including streams, lakes, submerged lands, and swamp lands, and to those ends may create parks, parkways, forest reservations, and other reservations and afforest, develop, improve, protect, and promote the use of the same in such manner as the board deems conducive to the general welfare.

The commissioners have the discretion to obtain such property through gift, purchase by cash or installment payments, or by appropriation, which can only occur through the manner provided in R.C. 163.01 to 163.22. Any gift of property must be approved by the probate court. R.C. 1545.11. The Park District has not obtained any property of its own.

4

{¶ 7} The second method of obtaining a purpose for a park district is through R.C. 1545.14, which is entitled "Cooperation with other public authorities." That section provides that the commissioners may enter into agreements with other legislative or public authorities in control of parks or park lands, whether within or without the park district, either (1) to assume control of all or a portion of any existing lands *or* (2) to otherwise contract or cooperate with the other public authority in connection with the "use, development, improvement, and protection of parks or park lands." (Emphasis added.) *Id.* It is important to note the disjunctive phrasing of the options.

{¶ 8} The commissioners of a park district do not need probate court approval before entering any agreement under R.C. 1545.14. The agreements are left to the discretion of the commissioners appointed to manage the park district. If the legislature had intended for the commissioners to seek probate court approval, language similar to sections 1545.11, 1545.12(B), and 1545.15, all of which require approval before the commissioners undertake specific actions, could have been included in R.C. 1545.14. *State ex rel. Cordray v. Court of Claims of Ohio*, 190 Ohio App.3d 161, 2010-Ohio-4437, 941 N.E.2d 93, ¶ 27 (10th Dist.) (the omission of language dictates the conclusion that the legislature did not intend the omitted language to have any force or effect in proceedings under the statutory section). The contracting option provides the park district with a limited role in which the township delegates some or all of its responsibility over park lands to the park district through an agreement.

{¶ 9} Although it is a far better practice to define that role in writing, there is no legislative requirement that a park district enter a written contract with the public authority; it

may simply Acooperate with@ the other political body for the maintenance, use, and development of the park lands. There is also no statutory requirement specifying the degree of control over the park lands that the public authority must delegate to the park district. According to the unambiguous terms of R.C. 1545.14, the public authority may retain any degree of control it deems necessary in contracting or cooperating with the park district. Regardless of which option is chosen, the park district is authorized to develop, improve, and protect those lands as if the lands were acquired by the commissioners. *Id.*

{¶ 10} The legislature also provided park districts with several options to obtain funding. The park district may levy a dedicated tax in an amount not to exceed one-half of one mill, but only "[a]fter the budget commission of the county in which the district is located certifies such levy, *or such modification thereof as [the budget commission] considers advisable*, to the county auditor, he shall place it upon the tax duplicate." (Emphasis added.) *Id.* Thus, it is within the commissioners' discretion whether to seek the dedicated tax, and even if the commissioners decide to pursue the independent source of funding, the county budget commission must certify the tax if they consider any portion of it advisable. *Id.* In this case, the Park District received the dedicated tax up until 2002. According to the master commissioner, the township eliminated it.[1] Despite the elimination of the tax, the township provided the Park District with its necessary funding C as would be expected considering the fact that the township still owned the properties and had an obligation and desire to ensure the continuing vitality of the park lands. *See* R.C. 511.37

---

(1.) It is not clear from the record under what authority the township could eliminate a county tax without the county budget commission's approval or action. The county budget commission is responsible for making any decisions whether to reduce or modify a tax levy of a park district. 2008 Ohio Atty.Gen.Ops. No. 08-020, at 21; R.C. 1545.20.

6

(township trustees may make contributions of money from its general fund to the park district for the purpose of planning, acquisition, management, and improvement); 1988 Ohio Atty.Gen.Ops. No. 88-033 (interpreting R.C. 511.37 to mean that the board of a park district does not need to seek approval of the funding terms from the probate court).

{¶ 11} In addition to the dedicated millage, the commissioners may directly submit a request for an additional tax levy to the voters by resolution. R.C. 1545.21. Outside of taxes, a park district may also receive a share of the undivided local government fund as determined by the county budget commission for the purpose of managing the park land properties. 2008 Ohio Atty.Gen.Ops. No. 08-020, at 21-22, citing R.C. 5747.51.

{¶ 12} In April 1985, the Park District and the Trustees negotiated an arm's-length agreement under R.C. 1545.14 wherein the Trustees, with "the authority and responsibility to operate and maintain park lands within Chester Township" agreed (1) to allow the Park District to assume control of all park lands owned by the township for a period of five years unless either party terminates the agreement with 90 days' advance notice; (2) that the Park District would operate, maintain, develop, improve, and protect the park lands for the residents of Chester Township and the public; (3) that subject to prior approval from the Trustees, the Commissioners could (a) enter agreements with other political subdivisions for the use and operation of the parks, (b) construct or alter permanent improvements on the park or park lands, and (c) contract for and incur debts that could result in liens being imposed on the township's park land properties; and (4) that the Commissioners must agree that no rangers or park officers shall be appointed other than police officers employed by the township. No one disputed the terms of that agreement.

7

**{¶ 13}** In 1993, following the expiration of the original agreement and a short period in which the Park District cooperated with the township to maintain the park lands without a formal agreement, the Park District and the township negotiated a second agreement nearly identical to the first. There were two material differences between the agreements: (1) the 1993 agreement was for a period of five years, to renew yearly into perpetuity, but subject to the same 90-day termination clause; and (2) the 1993 agreement was not for the stated purpose of the Park District assuming all control over the township's park lands. The Park District had a more limited role. The Park District only had the contractual authority to use, develop, improve, and protect the park lands within the township and subject to the limitations to which the Park District agreed. No one, and certainly neither of the real parties in interest to the agreement, challenged any aspect of the 1993 agreement in any court of competent jurisdiction.

**{¶ 14}** In the early part of 2014, an anonymously drafted "report" surfaced, entitled "Chester Township Park District 2013 Review" ("the review"). The review questioned the Park District's financial affairs. Under R.C. 1545.06, which provides that any park commissioner may be removed at the discretion of the probate judge, the probate court had continuing jurisdiction to sua sponte consider removing any one of the Commissioners based on those allegations of financial misconduct. If, in exercising its grant of continuing jurisdiction, the probate court felt it necessary to remove any Commissioner, the court was required to provide that Commissioner with at least ten days' notice ahead of the statutorily mandated public hearing. R.C. 1545.06.

8

**{¶ 15}** Upon receiving the review, the probate court appointed Attorney Mary Jane Trapp as the master commissioner under the court's "fiduciary oversight authority." During the proceedings on the master commissioner's report, the probate court clarified that its jurisdiction was derived from R.C. 2101.06 and R.C. 1545.06, although no individual Commissioner was ever put on notice that the court intended to remove any one of them from office.

**{¶ 16}** A master commissioner's duties under R.C. 2101.06 should not be confused with the probate court's authority to appoint an investigator as statutorily provided in other probate matters, such as guardianship proceedings. R.C. 3109.04(C) (a probate court can order an investigation, but the investigator must be made available for cross-examination at trial); R.C. 2111.042 (a probate court may appoint an investigator to review the guardianship of a minor). The statute, R.C. 2101.06, unlike other provisions in the Revised Code dealing with the authority of a probate court, does not authorize the trial court to appoint an investigator. *See, e.g.,* R.C. 2151.28(I) (a guardian ad litem's functions include "investigation, mediation, monitoring court proceedings and monitoring services provided for the child"). Generally, if a court appoints an investigator when statutorily authorized to do so, "[t]o protect the parties' due process rights, the trial court must make [the investigator] available for direct and cross-examination." *In re A.L.,* 6th Dist. Lucas No. L-10-1355, 2011-Ohio-2569, ¶ 35. The legislature=s decision to provide statutory authority for the probate court to investigate in other proceedings but omit such language from the statute authorizing the appointment of a master commissioner must be presumed to be for a purpose. *State ex rel. Cordray,* 190 Ohio App.3d 161, 2010-Ohio-4437, 941 N.E.2d 93,

9

at ¶ 27 (10th Dist.), citing *State ex rel. Fink v. Registrar, Ohio Bur. of Motor Vehicles*, 12th Dist. Butler No. CA98-02-021, 1998 Ohio App. LEXIS 4261 (Sept. 14, 1998); and *Metro. Secs. Co. v. Warren State Bank*, 117 Ohio St. 69, 76, 158 N.E. 81 (1927).

{¶ 17} The appointment of a master commissioner under R.C. 2101.06 is analogous to the appointment of a magistrate. *See, e.g., State ex rel. Estate of Hards v. Klammer*, 110 Ohio St.3d 104, 2006-Ohio-3670, 850 N.E.2d 1197, ¶ 3 (appointed guardian filed suit on behalf of ward, and master commissioner appointed under R.C. 2101.06 and Civ.R. 53 to resolve motions and applications regarding the dispute); R.C. 2101.31. The master commissioner resolves issues of fact. R.C. 2101.31. After a master commissioner has been "properly appointed by the probate court," she has a statutory duty to take sworn evidence and render a report just as a magistrate would issue a magistrate's decision subject to court approval. *State ex rel. Estate of Hards v. Klammer*, 11th Dist. Lake No. 2004-L-189, 2005-Ohio-2655, ¶ 21. The parties have the right to file objections as any party would under Civ.R. 53 or its equivalent. R.C. 2101.06 ("[t]he report may be excepted to by the parties and confirmed, modified, or set aside by the court.").

{¶ 18} The probate court in this case tasked the master commissioner with addressing the issues raised in the review and to determine, examine, and either resolve or provide the probate court with a proposed resolution. As the probate court requested, and the master commissioner understood, her task was to investigate the allegations in the review and provide recommendations for the "best practices" under which the Park District should operate.

10

**{¶ 19}** Complicating matters, the master commissioner's report was not filed as part of the record, nor did the probate court require such. It appears that the report was provided to the probate court, published on the court's website, but never entered into the record of the proceedings. The journal entry "confirming" the report incorporates the report by reference, but the report was not attached to the judgment entry either.

**{¶ 20}** Both parties have invited us to consider the master commissioner's report as it was considered by the Ohio Supreme Court in *State ex rel. Chester Twp. v. Grendell*, 147 Ohio St.3d 366, 2016-Ohio-1520, 66 N.E.3d 683. Although we recognize that the Ohio Supreme Court reviewed the report as evidence in the original writ action and not upon the probate court's record, if any error exists in considering the report for the purposes of this appeal, such an error was invited by agreement among the parties. Further, if the report is not considered, there was no evidence before the probate court upon which the court could have acted. The probate court's orders are all premised on the findings and conclusions within the master commissioner's report.

**{¶ 21}** In the master commissioner's report, the master commissioner determined upon her "research and discussions with those involved with the park district's formation" that the intent behind the Park District's creation was to keep the township politics out of the park district. The master commissioner ultimately concluded, through interviews and research, that the Park District and its employees had not committed any knowing violations of Ohio law. Several policy and procedure "recommendations" were also provided. No sworn testimony was taken, nor did the probate court require the master commissioner to do so or resolve any factual disputes. After submitting the report, the

11

probate court made several findings of facts and conclusions of law but otherwise adopted the master commissioner's unfiled report. Judgment Entry Findings of Fact Conclusions of Law, November 26, 2014 ("Confirmation Order").

{¶ 22} At the same time the master commissioner was reviewing the allegations against the Commissioners regarding financial decisions, a state agency was conducting a formal audit of the Park District's finances relating to the same allegations. The Park District is required to present its yearly budget to the Geauga County Budget Commission and to the township trustees in order to comply with R.C. 5705.36(A)(1). As part of that process, the township fiscal officer had requested a state audit of the Park District that was under way as of the date of the master commissioner's report. It appears the probate court appointed the master commissioner to investigate that which other executive agencies were in the process of reviewing. The probate court could not have been aware of the audit at the time it appointed the master commissioner, but there was no consideration of the separate audit after the fact was disclosed in the master commissioner's report. The outcome of the audit is not in the record before us.

{¶ 23} In the Confirmation Order, the probate court went further than reviewing the conduct of the Commissioners and specifically concluded that (1) the Trustees had terminated the dedicated millage for the Park District, directly contravening the fundamental purpose for creating the Park District; (2) the 1993 agreement addressing the Trustees' contractual right to review any construction or alteration of any permanent improvement on the park lands impeded the Park District's separate purpose; (3) the Commissioners had the sole statutory authority to levy the millage under R.C. 1545.20; (4)

12

the Trustees must provide funding until the Park District sets up its independent funding through dedicated millage; and (5) the Park District, the Commissioners, and the Park District's employees must comply with the recommendations made by the master commissioner regarding the Αbest practices@ for operating a park district.

{¶ 24} The Trustees appealed the Confirmation Order, but the original appeal was dismissed for the want of jurisdiction. The Confirmation Order had not finalized the actual costs associated with the master commissioner's investigation, even though the parties were ordered to split the undetermined costs with the probate court. *In re Creation of Park Dist. Within Chester Twp.*, 11th Dist. Geauga No. 2014-G-3242, 2015-Ohio-1210, ¶ 7. Without the imposition of a specific cost, the probate court's decision was not a final one within the meaning of R.C. 2505.02.

{¶ 25} After the appeal was dismissed, the Trustees sought a writ of prohibition from the Ohio Supreme Court. In denying the writ, it was held that the Trustees "clearly have an adequate remedy in the ordinary course of the law by way of appeal." *Grendell,* 147 Ohio St.3d 366, 2016-Ohio-1520, 66 N.E.3d 683, at ¶ 21. Because the probate court did not patently and unambiguously lack jurisdiction over the potential removal of the Commissioners, the writ had to be denied. *Id.* at ¶ 30. There was an express reluctance to circumvent the appellate process. *Id.* at ¶ 31. Indeed, it has been continually maintained that a "court having general subject-matter jurisdiction can determine its own jurisdiction, and a party contesting that jurisdiction has an adequate remedy by way of appeal." *State ex rel. Huntington Natl. Bank v. Kontos*, 145 Ohio St.3d 102, 2015-Ohio-5190, 47 N.E.3d 133, ¶ 19, citing *State ex rel. Shumaker v. Nichols*, 137 Ohio St.3d 391, 2013-Ohio-4732,

13

999 N.E.2d 630, ¶ 10, and *State ex rel. Plant v. Cosgrove*, 119 Ohio St.3d 264, 2008-Ohio-3838, 893 N.E.2d 485, ¶ 5.

**{¶ 26}** The probate court believed it maintained continuing jurisdiction over the Trustees based on the Ohio Supreme Court's statement that

> [t]he probate court's authority to create park districts and its plenary power "to dispose fully of any matter" that is properly before it *surely includes the ability to issue orders to enforce the entry creating the park district*, including orders that impose duties on those interfering with the park district's purposes.

(Emphasis added.) *Id.* at ¶ 30. As we have already discussed, the 1984 order creating the Park District imposed no prospective obligations on any parties, much less the Trustees or the township. Although there is no question the probate court has some plenary power under its statutory grant of continuing jurisdiction, that power is not unbridled. In this regard, it is important to understand what was decided in *Grendell* and what was not. The case was an original action for a writ of prohibition. The only matter to be resolved was whether the probate court patently and unambiguously lacked jurisdiction over a specific matter. *Salloum v. Falkowski*, 11th Dist. Lake No. 2015-L-124, 2016-Ohio-5005, ¶ 32 (Grendell, J., concurring) (in a writ of prohibition action, the court is not "called upon to decide whether the lower court's exercise of jurisdiction over the underlying case is proper, only whether there is a 'patent and unambiguous' lack of jurisdiction"). It was not an action to determine whether the probate court possessed jurisdiction over any particular issue. *Id.*, citing *Grendell* at ¶ 31 (it was only decided whether the probate court patently and unambiguously lacked jurisdiction, and after concluding that it did not, the court was unwilling "to issue a writ and circumvent the appellate process").

14

**{¶ 27}**  Nevertheless, in May and June 2016, the probate court entered two additional orders citing the Ohio Supreme Court's obiter dictum as the basis of its jurisdiction to proceed.  In the May order, the probate court found certain provisions in the 1993 agreement to be in conflict with the Park District's authority and ordered the parties to negotiate a new agreement.  In the June judgment entry, the probate court further held (1) that the 1993 agreement between the Park District and the township infringes on the Park District's authority to assume all control of all park lands within the territorial limits of the Park District, allegedly conflicting with R.C. Chapter 1545, and (2) that the Park District and the township must bear 75 percent of the $40,000 cost of the master commissioner under R.C. 2101.06 and 2101.07.

**{¶ 28}** The fees were imposed against the township under the belief that the probate court has a plenary power to prevent others from interfering with the Park District's purposes under R.C. 2101.24(C), and as a result, the court could order any such party to pay the costs of investigating the Park District's operations despite the fact that those parties had no control over the Park District's operational management.  Further, the probate court held that the creation of the Park District meant that all the "township's lands used for township park purposes, regardless of the record ownership, are under the jurisdiction of the Park Board" at the expense of the title owner's property rights and R.C. 1545.14, which expressly provides any public authority the ability to delegate some authority to a park district without surrendering all control over the park lands.  In light of its sua sponte findings, the probate court concluded that the portions of the 1993 agreement that vested any control over the park lands with the Trustees were not enforceable, and the

15

township was "permanently restrained and enjoined" from enforcing or acting on any of those provisions that preserved the township's authority over its own park lands.

{¶ 29} This appeal followed in which the Trustees claim the probate court exceeded its jurisdiction by sua sponte voiding the terms of a lawful agreement entered under R.C. 1545.14 in the Confirmation Order and the June 2016 order and erred by imposing the master commissioner=s fees as costs against the township.

{¶ 30} At the most basic of levels, the probate court's orders all depend on the proper invocation of the court's continuing jurisdiction over the Park District.  In order for a court to exercise any judicial power or resort to its plenary power at law, it must have continuing jurisdiction over the subject matter of the dispute.  *State ex rel. McGinty v. Eighth Dist. Court of Appeals*, 142 Ohio St.3d 100, 2015-Ohio-937, 28 N.E.3d 88, ¶ 13.  A court in want of jurisdiction cannot exercise its judicial power by entering any judgment or order in furtherance of a case.  *Id.* at ¶ 27.  Further, a court with jurisdiction to act is limited to reviewing only those issues within the scope of that jurisdiction.  *Mitchell v. Mitchell*, 11th Dist. Portage No. 2007-P-0023, 2008-Ohio-833, ¶ 67 (the trial court, although possessing jurisdiction over some of the issues, exceeded its jurisdiction by ordering the manner in which an asset should be distributed and that portion of the order must be vacated); *see also Lisboa v. Karner*, 167 Ohio App.3d 359, 2006-Ohio-3024, 855 N.E.2d 136; *Tanagho v. Tanagho*, 10th Dist. Franklin No. 92AP-1190, 1993 Ohio App. LEXIS 1201, 10 (Feb. 23, 1993).

{¶ 31} "Probate courts are courts of limited jurisdiction and may hear only those types of cases expressly authorized by the applicable statutes."  *Swift v. Gray*, 11th Dist.

16

Trumbull No. 2007-T-0096, 2008-Ohio-2321, ¶ 37-39, citing *Rudloff v. Efstathiadis*, 11th Dist. Trumbull No. 2002-T-0119, 2003-Ohio-6686, ¶ 6, and *Schucker v. Metcalf*, 22 Ohio St.3d 33, 34, 488 N.E.2d 210 (1999). A court cannot create its own jurisdiction C it only has "such jurisdiction as may be provided by law." Ohio Constitution, Article IV, Section 3(B)(2). " 'The existence of the court's own subject-matter jurisdiction in a particular case poses a question of law which the court has the authority and responsibility to determine.' " *Id.,* quoting *Burns v. Daily*, 114 Ohio App.3d 693, 701, 683 N.E.2d 1164 (11th Dist.1996). Appellate courts "review that determination de novo without any deference to the conclusion reached below." *Id.*, citing *Burns*.

**{¶ 32}** R.C. 2101.24 is silent with respect to the probate court's jurisdiction over park districts. Instead, R.C. 2101.24(A)(2) provides that probate courts have jurisdiction if another section of the Revised Code expressly confers jurisdiction over that subject matter upon the probate court and no other section of the Revised Code confers jurisdiction over that subject matter upon any other court or agency. A probate court's jurisdiction over a park district is, therefore, solely governed by R.C. Chapter 1545. That chapter confers upon the probate court continuing jurisdiction over a park district case in order

(1) to appoint the park district's board of commissioners, R.C. 1545.05(A);

(2) to expand the board to five members upon the park district's request, R.C. 1545.05(B);

(3) to remove any commissioners after providing a hearing and no less than 10 days' notice of the intent to do so, R.C. 1545.06 (and this may include the power to investigate certain conduct related to any one commissioner);

(4) to approve the park district's acceptance of donations of money or property, R.C. 1545.11;

17

(5) to approve the sale of lands if the lands are within the county of the probate court's territorial jurisdiction, R.C. 1545.12(B);

(6) to approve the annexation of any territory within the probate court's territorial jurisdiction, R.C. 1545.15; and

(7) to dissolve the park district if the results of a certified vote are presented to the probate court or the park district is inactive for a period of five years, R.C. 1545.36 and 1545.38.

The probate court's continuing jurisdiction as set forth in R.C. Chapter 1545 is narrow. *See Grendell,* 147 Ohio St.3d 366, 2016-Ohio-1520, 66 N.E.3d 683, at ¶ 23 (probate court's jurisdiction over the park district is derived from R.C. Chapter 1545 and is limited to dissolving the park district or appointing and removing commissioners, and the only role the township trustees have is in applying for the creation of the park district). Importantly, the probate court's continuing jurisdiction is limited to certain acts or questions involving the park district's board of commissioners or over the commissioners themselves as it relates to the court's power to appoint and remove. There are no other statutory sections providing the probate court with (1) a general supervisory power over park district matters or (2) any additional jurisdiction over a party or entity other than the park district's board of commissioners.

{¶ 33} Although the probate court has plenary power at law and in equity over some matters, those matters must be "properly before the court," i.e.*,* based on the grant of jurisdiction. R.C. 2101.24(C) is not an independent source of the probate court's jurisdiction. Likewise, R.C. 2101.06 is not an independent source either. *Klammer,* 110 Ohio St.3d 104, 2006-Ohio-3670, 850 N.E.2d 1197, at ¶ 3. In that latter section, the legislature unambiguously provided that a probate court Ꜳmay appoint a special master

18

commissioner *in any matter pending* before the judge.@ (Emphasis added.) R.C. 2101.06. As the Ohio Supreme Court noted in *Klammer*, if a probate court has basic statutory jurisdiction, such as to appoint and remove guardians, then that court also has basic statutory authority to appoint a special master commissioner under R.C. 2101.06 to carry out its fact-finding function. *Id.* Thus, in order to have jurisdiction to appoint a master commissioner, there must be a matter properly pending before the probate court at the time. *Id.* Both R.C. 2101.24(C) and 2101.06 are confined by the probate court's jurisdiction; neither expands it. A court must possess jurisdiction over the matter before exercising its plenary power. *McGinty*, 142 Ohio St.3d 100, 2015-Ohio-937, 28 N.E.3d 88.

**{¶ 34}** In this case, the probate court's continuing jurisdiction over the park district matter is solely dependent on R.C. Chapter 1545. In this regard, the probate court had jurisdiction to consider the removal of the Commissioners. R.C. 1545.06. As a result, the appointment of the master commissioner to take testimony and report the testimony with respect to the potential removal of a Commissioner is not the issue.

**{¶ 35}** The issue before us is whether the probate court exceeded the scope of its continuing jurisdiction to consider removing any one of the Commissioners, (1) by imposing costs upon the township as a separate legal entity C incurred through the appointment of the master commissioner for the express purpose of investigating allegations of financial misconduct within the Park District and to provide consulting services to the Park District; and (2) by invalidating a contractual agreement entered between the Park District and the township defining the scope of the Park District's involvement with the township's park lands. *Mitchell*, 11th Dist. Portage No. 2007-P-0023, 2008-Ohio-833, at ¶ 67.

19

**{¶ 36}** The grant of continuing jurisdiction under Revised Code Chapter 1545.06 is limited. The probate court exceeded its continuing jurisdiction to remove a commissioner in appointing the master commissioner to investigate all aspects of the Park District=s operations and its contractual relationship with the township and then impose those costs upon the township, a separate and distinct political body. The probate court also lacked jurisdiction to sua sponte enjoin the township from enforcing the negotiated contract terms of the 1993 agreement. The probate court's jurisdiction, as applicable in this case, is statutorily limited to determining whether to remove any of the Commissioners. More simply stated, the legislature has not provided the probate court with a general grant of fiduciary oversight over the Park District. *Grendell*, 147 Ohio St.3d 366, 2016-Ohio-1520, 66 N.E.3d 683, at ¶ 27 (the legislature did not provide probate courts with a general supervisory power over park districts). Although we recognize that the probate court judge acted with good intentions in seeking the master commissioner's report before acting on the allegations in the review and that the master commissioner herself acted in good faith, nevertheless, there are limitations as to the scope of the probate court's jurisdiction under the statute.

**{¶ 37}** Because the trial court exceeded the grant of continuing jurisdiction, the Confirmation Order and the June 2016 order were not within the purview of the probate court's plenary power over matters properly before it under R.C. 2101.24(C). Those orders must be vacated. Once the probate court concluded that removal of the commissioners was unnecessary based on the master commissioner's report, the inquiry should have terminated. No other action was authorized by the legislature, and the township is not a

20

party over which the probate court has continuing jurisdiction C the township has no authority to remove or appoint any of the Commissioners. The master commissioner's fees imposed as costs against the township were improper.

{¶ 38} None of this is to suggest that the Park District is without protection or recourse with respect to others interfering with the Park District's operations or in resolving contract disputes over agreements entered under R.C. 1545.14 C the two primary areas of concern upon which the probate court acted.

{¶ 39} As a separate and distinct political entity, the Park District is capable of suing and being sued in a court of competent jurisdiction. *Marrek v. Cleveland Metroparks Bd. of Commrs.*, 9 Ohio St.3d 194, 195, 459 N.E.2d 873 (1984); R.C. 1545.07; *see also Schenkolewski v. Cleveland Metroparks Sys.*, 67 Ohio St.2d 31, 37, 426 N.E.2d 784 (1981). If a contract dispute erupts under any agreement entered under R.C. 1545.14, the Park District is authorized to file a breach of contract or declaratory judgment action to determine its rights and obligations under the agreement. *Buckman-Peirson v. Brannon*, 159 Ohio App.3d 12, 2004-Ohio-6074, 822 N.E.2d 830, ¶ 12 (2d Dist.); *Bd. of Twp. v. Bd. of Park Commrs.*, 4th Dist. Pickaway No. 80 CA 21, 1981 Ohio App. LEXIS 13397, 3 (Nov. 20, 1981). A probate court, however, lacks jurisdiction to enter declaratory judgments over contract disputes. *Brannon.* (R.C. 2101.24 does not grant a probate court jurisdiction to resolve breach of contract actions or a declaration of rights under an enforceable contract).

{¶ 40} Further, if the Commissioners feel the need to protect the Park District from outside interference, R.C. 1545.09(A) mandates that the Commissioners adopt bylaws and rules as they deem advisable for "the preservation of good order within and adjacent to

21

parks and reservations of land, and for the protection and preservation of the parks, parkways, and other reservations of land under its jurisdiction and control and of property and natural life therein."  If the Commissioners enact bylaws to preclude others from interfering with the good order and maintenance of the park district, there are statutory procedures and penalties available for relief that the park district could pursue in a court of competent jurisdiction.  *Id.*; R.C. 1545.99; *see, e.g., Cleveland Metro. Park Dist. v. Fladda*, 63 Ohio Misc.2d 110, 112, 619 N.E.2d 1244 (M.C.1993) (although its authority is constitutionally vague, the park district had authority to enact rules governing the use of the park lands subject to the penalty restrictions provided by statute); *In re DeGeronimo*, 8th Dist. Cuyahoga No. 40089, 1979 Ohio App. LEXIS 11282, 7 (June 28, 1979) (the board of park commissioners has the power to adopt rules and regulations for the preservation of order within the park lands under its control).  Much like the Commissioners' unilateral ability to contract under R.C. 1545.14, the legislature has not required the Commissioners to seek probate court approval before enacting any bylaws.

{¶ 41} Despite the limitations on the scope of the probate court's continuing jurisdiction, the Park District, as a separate and distinct political entity, has statutory mechanisms at its disposal to protect its rights and those of the public it serves.

{¶ 42} We sustain the two assignments of error.[2] Although the probate court possessed continuing jurisdiction to consider removing any of the Commissioners as the current proceedings originated, the scope of that jurisdictional grant of authority was limited. The probate court exceeded its jurisdiction by imposing the master commissioner=s fees as costs against an unrelated political agency and by considering the validity of a contractual agreement entered between two separate and distinct political entities. We reverse and vacate the Confirmation Order and June 2016 order.

{¶ 43} It is ordered that appellant recover from appellee costs herein taxed.

{¶ 44} The court finds there were reasonable grounds for this appeal.

{¶ 45} It is ordered that a special mandate be sent to said court to carry this judgment into execution.

{¶ 46} A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

WILLIAM A. KLATT, J., Tenth Appellate District, sitting by assignment,

PATRICK M. MCGRATH, J., Retired, Tenth Appellate District, sitting by assignment,

concur.

---

(2.) The Trustees had filed a motion to stay the lower court's proceedings following the filing of this appeal. During the appellate proceedings, the Trustees supplemented the record with a decision from Judge John J. Lohn, who sat by assignment in the probate proceedings after Judge Timothy J. Grendell recused himself from the proceedings, which occurred while this case was on appeal and was outside the scope of our review. The decision issued by Judge Lohn appears to have resolved the issues raised in the motion to stay, and we deny it as moot.